

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

EMR:RAS  
F. #2016R02114

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

July 22, 2024

<u>By E-Mail and ECF</u>

The Honorable LaShann DeArcy Hall  
United States District Court  
Eastern District of New York  
225 Cadman Plaza East  
Brooklyn, New York 11201

        Re:    <u>United States v. Luz Elvira Cardona</u>  
                <u>Criminal Docket No. 21-622 (LDH)</u>

Dear Judge DeArcy Hall:

        The government respectfully submits this letter in anticipation of the September 26, 2024 sentencing of defendant Luz Elvira Cardona. On October 19, 2023, following a four week trial before this Court, a jury found the defendant guilty of Counts Three, Four, and Six of a nine-count, redacted indictment. (Presentence Investigation Report ("PSR") ¶ 1). Those convictions include sex trafficking minor victim Jane Doe #2, including through use of force, fraud, or coercion, in violation of 18 U.S.C. § 1591(b)(1), (b)(2) (Count Three); transportation of Jane Doe #2 with intent that Jane Doe #2 engage in prostitution, in violation of 18 U.S.C. § 2423(a) (Count Four); and Travel Act conspiracy in connection with the defendant's prostitution business, in violation of 18 U.S.C. § 371 (Count Six).

        For the reasons set forth below, the government respectfully requests that the Court impose a significant sentence above the mandatory minimum term of incarceration taking into account the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range of life imprisonment.

    I.    <u>Facts of the Offense</u>

        A.    <u>The Organization</u>

        For well over a decade, members of the Cid-Hernandez Sex Trafficking Organization engaged in the sex trafficking of women and minor girls and the promotion of

prostitution. The defendants Luz Elvira Cardona (the defendant), Roberto Cesar Cid Dominguez, Blanca Hernandez Morales and Jose Facundo Zarate Morales (collectively, the "Trial Defendants"), all of whom are related by blood or common-law marriage, used force, threats of force, fraud and coercion to cause young women and minor girls from Mexico to engage in prostitution in the United States. (PSR ¶¶ 7-11). Members of the organization pressured the victims, including two minor victims, to travel to the United States with false promises of employment and a better life. (PSR ¶¶ 41-75). When the young girls arrived in New York, they were forced by the Trial Defendants to work in prostitution. (PSR ¶¶ 41-75).

The Trial Defendants, including the defendant, comprised the main members of the Cid-Hernandez Sex Trafficking Organization. (PSR ¶ 7). Some of the victims of the Organization were the Trial Defendants' family members, including, Jane Doe #1, who is Hernandez Morales's much younger cousin, and Jane Doe #2 who is the defendant's niece. (PSR ¶¶ 12-13).

The Cid-Hernandez Sex Trafficking Organization was based in Queens, New York but transported young women and minor girls to prostitution clients throughout the State of New York and elsewhere. The organization controlled "routes," which were comprised of contact lists of potential clients in specific areas, and employed individuals who served as drivers. (PSR ¶ 20). The drivers were responsible for transporting women along preassigned routes to prostitution clients. (PSR ¶ 20). The Organization advertised its service using cards, which were distributed primarily to Hispanic men in different communities. (PSR ¶ 34). In order to ensure clients saw a variety of girls or women, drivers were instructed to deliver a woman or girl for one week before rotating her out with another woman or girl for "deliveries" the following week. (PSR ¶ 22). In some instances, the woman or girl working was provided with fifty percent of the income at the end of each night they worked, with the remaining fifty percent going to the route owner. (PSR ¶ 23). Drivers of the routes were paid a set amount. (PSR ¶ 23).

To avoid detection by law enforcement, participants of the Cid-Hernandez Sex Trafficking Organization, and victims acting at its direction, used a variety of fake names. (PSR ¶ 35). Hernandez Morales and Cid Dominguez also provided drivers for the Organization with different cars for transporting victims to prostitution appointments. (PSR ¶ 35). Changing cars prevented law enforcement from detecting drivers operating familiar vehicles. (PSR ¶ 35). In addition, in Brewster, New York, Cid Dominguez bribed a Village of Brewster police officer, Wayne Peiffer, with free sexual services in order to protect the Organization. (PSR ¶¶ 37-38).

1. <u>Jane Doe # 1</u>

In 2004, when Jane Doe #1 was fifteen years old, Hernandez Morales arranged for Jane Doe #1 to travel from Mexico to the United States with Hernandez Morales's two children and another adult. (PSR ¶ 46). Jane Doe #1 did not speak English, had no identification or legal status in the United States, had no money, had never been to the United States prior, and had only completed her first year of high school. (PSR ¶ 46). In other words, Jane Doe #1 was a young, helpless child with no means of supporting herself in a foreign country where she did not

speak the language. Once Jane Doe #1 arrived in New York, Hernandez Morales picked Jane Doe #1 and Hernandez Morales's children up and brought them all to the Queens residence. (PSR ¶ 46). While Hernandez Morales registered her own children for school, she did not register Jane Doe #1, and instead put Jane Doe #1 to work. (PSR ¶ 46).

Within one week of Jane Doe #1 arriving in New York, Hernandez Morales told Jane Doe #1 that she was expected to work in prostitution. (PSR ¶ 48). Jane Doe #1 began seeing as many as fifteen-to-twenty men per night. (PSR ¶ 52). Eventually, Hernandez Morales gave Jane Doe #1 a book with phone numbers of drivers and instructed Jane Doe #1 to call other drivers. (PSR ¶ 52).

Jane Doe #1 lived with members of the Organization in Queens, New York for approximately two years. (PSR ¶ 54). During the entirety of that time, Jane Doe #1 engaged in prostitution five to seven days per week for the benefit of the Cid-Hernandez Sex Trafficking Organization. (PSR ¶ 54).

The conduct relating to Jane Doe #1 is included as part of the Count Six conspiracy charge, but the defendant is not charged with directly sex trafficking Jane Doe #1.

2. <u>Jane Doe # 2</u>

In 2007, when Jane Doe #2 was fifteen years old, the defendant—Jane Doe #2's aunt—arranged for Jane Doe #2 to travel from Mexico to the United States. (PSR ¶ 58). The defendant offered to loan Jane Doe #2 the money Jane Doe #2 needed to travel to New York under the guise that Jane Doe #2 could work in house cleaning in the United States and financially support Jane Doe #2's parents. (PSR ¶ 58). Jane Doe #2 had only a third-grade education, did not speak English, had no documentation or legal status in the United States, and had never previously been to the United States. (PSR ¶ 58). Like Jane Doe #1, Jane Doe #2 was a young, helpless child with no means of supporting herself in a foreign country where she did not speak the language. Once Jane Doe #2 arrived in New York, the defendant picked Jane Doe #2 up and brought her to the Queens residence, where all of the Trial Defendants lived. (PSR ¶ 59).

Jane Doe #2 worked at a pizzeria for a few days before the defendant and Zarate Morales provided her with business cards to hand out. (PSR ¶ 60). The cards featured flowers, as well as the phone numbers of the defendant, Zarate Morales, and Hernandez Morales. (PSR ¶ 60). Jane Doe #2 learned that the cards were advertising a prostitution business and no longer wanted to hand out the cards. (PSR ¶ 60). The defendant told Jane Doe #2 that Jane Doe #2 had to work in order to pay back the "debt" owed to the defendant for the cost of smuggling Jane Doe #2 into the United States. (PSR ¶ 60). Zarate Morales and Hernandez Morales agreed that Jane Doe #2 had to pay back the debt. (PSR ¶ 60). After Jane Doe #2 stopped handing out cards, members of the Organization, including the defendant, forced her to engage in prostitution. (PSR ¶ 61).

When Jane Doe #2 began working in prostitution for the Organization, she was still fifteen years old and had never had sex before. (PSR ¶ 61). The defendant, Hernandez Morales, and Zarate Morales proceeded to advertise and sell Jane Doe #2's virginity to the highest bidder. (PSR ¶ 62). The defendant prepared Jane Doe #2 for her first prostitution appointment and explained to Jane Doe #2 how to have sex. (PSR ¶ 62). Zarate Morales then drove Jane Doe #2 to the first client's house in Port Chester (Hernandez Morales's route). (PSR ¶ 62). When they arrived, Zarate Morales contacted the client who came outside to meet Zarate Morales and Jane Doe #2. (PSR ¶ 63). The client paid Zarate Morales directly for an hour with Jane Doe #2 and took Jane Doe #2 inside his house where Jane Doe #2 was forced to have sex for the first time. (PSR ¶ 63). During the hour, Zarate Morales waited on another street for Jane Doe #2 in order to avoid law enforcement detection. (PSR ¶ 63). After the hour passed, the client called Zarate Morales who retrieved Jane Doe #2. (PSR ¶ 63). Jane Doe #2 did not receive any payment. (PSR ¶ 63). Zarate Morales continued to drive Jane Doe #2, requiring her to perform sexual acts on several other men that same night. (PSR ¶ 63). Jane Doe #2 protested, but Zarate Morales told her she owed money to the defendant and continued to drive her to engage in sex with clients. (PSR ¶ 63). Zarate Morales continued to drive Jane Doe #2 that first night until approximately 3:00 a.m. (PSR ¶ 63). Jane Doe #2 testified that she felt "filthy and sad" because she was forced to have sex for the first time. (PSR ¶ 63). The money Jane Doe #2 earned that night went to the defendant and Zarate Morales. (PSR ¶ 63). When Jane Doe #2 complained to the defendant about being forced to engage in sex work, the defendant reminded Jane Doe #2 that Jane Doe #2 owed the defendant $10,000. (PSR ¶ 63).

For months after that first traumatic evening, Jane Doe #2 was forced to work in prostitution on a daily basis despite her pleas to stop. (PSR ¶ 64). Jane Doe #2 worked every day from 4:00 p.m. to 3:00 a.m. (PSR ¶ 64). The defendant gave Jane Doe #2 pills to prevent her from menstruating to allow her to work more and would put makeup on fifteen-year-old Jane Doe #2 to make her look older. (PSR ¶¶ 64-65). Zarate Morales and Hernandez Morales were among the individuals who drove Jane Doe #2 to prostitution appointments. (PSR ¶ 64). Jane Doe #2 typically saw twenty-to-twenty-five clients each night, with each appointment lasting about fifteen minutes. (PSR ¶ 64). The defendant instructed Jane Doe #2 to charge $30 per session. (PSR ¶ 64). All of the money Jane Doe #2 earned, including tips, had to be turned over to the defendant. (PSR ¶ 64). Jane Doe #2 testified that the clients were not always hygienic or sober. (PSR ¶ 64). On one occasion Jane Doe #2 was subjected to violence at the hands of an intoxicated client. (PSR ¶ 64). The client demanded to have unprotected sex with Jane Doe #2 and Jane Doe #2 refused. (PSR ¶ 64). The client then threatened Jane Doe #2 with a knife in an effort to force her. (PSR ¶ 64). Another male in the house helped Jane Doe #2 allowing her to flee the house. (PSR ¶ 64). Jane Doe #2 reported what happened to Zarate Morales who was driving her. (PSR ¶ 64). Zarate Morales only stated that he would not take her back to that house, but he required her to keep working that night. (PSR ¶ 64). When Jane Doe #2 told the defendant what happened, the defendant told her she had to continue working. (PSR ¶ 64).

When Jane Doe #2 returned to the Trial Defendants' house after a night of work, Hernandez Morales and the defendant counted the condoms Jane Doe #2 had remaining in order to verify how many men Jane Doe #2 had sex with and how much money she should have earned

to ensure Jane Doe #2 did not keep any money for herself. (PSR ¶ 65). Jane Doe #2 was permitted to contact her parents in Mexico by phone, but the defendant monitored those calls and Jane Doe #2's parents did not know she was working in prostitution. (PSR ¶ 66). At times, Jane Doe #2 told members of the Organization that she did not want to work. Both the defendant and Zarate Morales threatened to send Jane Doe #2 to immigration authorities. (PSR ¶ 67). Hernandez Morales and the defendant both told Jane Doe #2 that immigration would lock her up. (PSR ¶ 67).

After some months, Jane Doe #2 was sent to live with Omar, an acquaintance of Hernandez Morales, because Jane Doe #2 had expressed that she did not want to continue working in prostitution and Hernandez Morales believed Omar would more forcefully discipline Jane Doe #2 into submission. (PSR ¶ 68). At first the money Jane Doe #2 earned working in prostitution while living with Omar was given to the defendant. (PSR ¶ 69). Later, Omar kept the money. (PSR ¶ 69). On at least two occasions while living with Omar, Hernandez Morales drove Jane Doe #2 to prostitution appointment. (PSR ¶ 69).

Jane Doe #2 escaped prostitution after a May 2008 raid on a brothel resulted in her rescue by law enforcement and subsequent placement in foster care. (PSR ¶ 70). Jane Doe #2 eventually ran away from foster care and was able to return to Mexico. (PSR ¶ 70).

3. <u>Jane Doe # 3</u>

Jane Doe #3 is Jane Doe #1's sister and Hernandez Morales's much younger cousin. Jane Doe #3 was a twenty-one-year-old native of Mexico when she came to the United States for the first time in 2008. (PSR ¶ 71). Upon arriving in the New York, Jane Doe #3 stayed with Hernandez Morales, the defendant, Zarate Morales, and Cid Dominguez, among others, at their residence in Queens. (PSR ¶ 71). Jane Doe #3 was told after she arrived that she had to work in the "chicas chicas" business in order to pay back the money that had been provided for her to cross the border and come to the United States. (PSR ¶ 72). Jane Doe #3 testified that Zarate Morales, Hernandez Morales, and Cid Dominguez, among others, were involved in a prostitution delivery business. (PSR ¶ 72). Jane Doe #3 further testified that the defendant handed out condoms and brought money earned by the family to the bank. (PSR ¶ 72). At first Jane Doe #3 handed out business cards for the family prostitution business. (PSR ¶ 73). Shortly thereafter, Hernandez Morales's minor daughter gave Jane Doe #3 condoms and drove her to work in prostitution. (PSR ¶ 73). Others, including Hernandez Morales, also drove Jane Doe #3 to prostitution appointments. (PSR ¶ 73). After a particularly traumatic experience while working in prostitution, Jane Doe #3 told Hernandez Morales that she no longer wanted to work in prostitution. (PSR ¶ 74). Hernandez Morales got angry and reminded Jane Doe #3 that Jane Doe #3 owed a debt. (PSR ¶ 74). However, after that night, Jane Doe #3 stopped working in prostitution and began working in a local bar to continue to satisfy the debt she purportedly owed her family. (PSR ¶ 74). After approximately eight months in the United States, Jane Doe #3 returned to Mexico. (PSR ¶ 75).

4. Jane Doe # 5

Jane Doe #5 was brought from Mexico to the United States in 2006 by an individual unrelated to the Cid-Hernandez Sex Trafficking Organization ("Individual-1"). (PSR ¶ 76). Jane Doe #5 had an elementary school education and knew no one in the United States other than Individual-1. (PSR ¶ 76). Individual-1 acted as Jane Doe #5's pimp and coordinated with the Cid-Hernandez Sex Trafficking Organization to have members of the Organization drive Jane Doe #5 to prostitution appointments. (PSR ¶ 76). On multiple occasions, Hernandez Morales personally drove Jane Doe #5 to prostitution appointments and Cid Dominguez and Zarate Morales each drove Jane Doe #5 to one appointment. (PSR ¶ 77). On one occasion Hernandez Morales drove Jane Doe #5 to an appointment where the client was drunk and became angry. (PSR ¶ 78). Although Jane Doe #5 indicated that she did not want to continue with the appointment, Hernandez Morales insisted that Jane Doe #5 treat the client well and please him. (PSR ¶ 78). After Jane Doe #5 left, the client asked for her again and, despite pleading with Hernandez Morales not to return, Hernandez Morales sent Jane Doe #5 back to have sex with the client again. (PSR ¶ 78). On a different night, when Rojas Lopez drove Jane Doe #5, Jane Doe #5 performed sexual acts on Wayne Peiffer (the law enforcement officer bribed by the Organization with sexual services in exchange for protection) while Peiffer was in uniform and inside his patrol car. (PSR ¶ 79). Jane Doe #5 stopped working in prostitution in 2011 or 2012. (PSR ¶ 80).

B. The Charges and Arrest

On October 19, 2023, the defendant was found guilty following a jury trial of Counts Three, Four, and Six of a nine-count redacted indictment.[1] (PSR ¶ 1). Those convictions include sex trafficking minor victim Jane Doe #2, including through use of force, fraud, or coercion, in violation of 18 U.S.C. § 1591(b)(1), (b)(2) (Count Three); transportation of Jane Doe #2 with intent that Jane Doe #2 engage in prostitution, in violation of 18 U.S.C. § 2423(a) (Count Four); and Travel Act conspiracy in connection with the defendant's prostitution business, in violation of 18 U.S.C. § 371 (Count Six). (PSR ¶¶ 2-4).

II. Guidelines Calculation

The government agrees with Probation's Guidelines calculation, which is set forth below.

---

[1] Certain counts charged by the grand jury were not presented to the jury, either because they did not relate to the defendants on trial or because the government chose not to proceed with the specific charges. In addition, the defendant was not charged in Counts One, Two, Five, Seven, Eight, or Nine of the redacted trial indictment. (PSR ¶ 5).

Count Three – Sex Trafficking Jane Doe #2

| | | |
|---|---|---:|
| | Base Offense Level (§ 2G1.3(a)(1)) | 34 |
| Plus: | Relative of victim (§ 2G1.3(b)(1)(A)) | +2 |
| Plus: | Commercial sex act completed (§ 2G1.3(b)(4)) | +2 |
| Plus: | Vulnerable victim (§ 3A1.1(b)(1)) | +2 |
| Plus: | Organizer or leader (§ 3B1.1(a)) | <u>+4</u> |
| | Total: | <u>44</u> |

Count Four – Transportation of Jane Doe #2

| | | |
|---|---|---:|
| | Base Offense Level (§ 2G1.3(a)(3)) | 28 |
| Plus: | Relative of victim (§ 2G1.3(b)(1)(A)) | +2 |
| Plus: | Commercial sex act completed (§ 2G1.3(b)(4)) | +2 |
| Plus: | Vulnerable victim (§ 3A1.1(b)(1)) | +2 |
| Plus: | Organizer or leader (§ 3B1.1(a)) | <u>+4</u> |
| | Total: | <u>38</u> |

Count Six – Travel Act Conspiracy

| | | |
|---|---|---:|
| | Base Offense Level (§§ 2X1.1(a), 2E1.2(a)(2), 2G1.31(a)(4)) | 24 |
| Plus: | Relative of victim (§ 2G1.3(b)(1)(A)) | +2 |
| Plus: | Offense involved a commercial sex act (§§ 2G1.3(b)(4))) | +2 |
| Plus: | Vulnerable victim (§ 3A1.1(b)(1)) | +2 |
| Plus: | Organizer or leader (§ 3B1.1(b)) | <u>+4</u> |
| | Total: | <u>34</u> |

Multiple Count Analysis (§ 3D1.4)

| | | |
|---|---|---:|
| Highest Adjusted Offense Level: | | 44 |
| Counts Three, Four and Six | +1 | |
| Plus:  Zero Units (§ 3D1.4) | | +0 |
| Plus:  Repeat and dangerous sex offender (§ 4B1.5(b)(1)) | | +5 |
| **Total:** | | **49** |

Where the total offense level exceeds 43, pursuant to Chapter 5, Part A (comment n.2), the offense level is treated as 43. The defendant's criminal history category is I, (PSR ¶ 188)), which results in an applicable Guidelines term of life imprisonment. Moreover, the defendant faces a statutory minimum term of imprisonment of fifteen years for Count Three. 18 U.S.C. § 1591(b)(1).

III.    Applicable Sentence

In determining the sentence to be imposed, the Court shall consider "the nature and circumstances of the offense and the history and characteristics of the defendant," as well as the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense and to promote both specific and general deterrence. See 18 U.S.C. § 3553(a). For the reasons set forth below, the government respectfully requests that the Court impose a significant sentence above the mandatory minimum term of incarceration taking into account the Guidelines range of life imprisonment.

There can be little doubt that the nature and circumstances of the offenses are serious. For well over a decade, the defendant participated in a sex trafficking business through which she exploited women and girls, including her own young family member, for profit. The defendant was primarily responsible bringing her then-15-year-old niece, Jane Doe #2, to the United State from Mexico with the intent of forcing Jane Doe #2 to engage in prostitution. When Jane Doe #2 arrived in New York, she was at the defendant's mercy.  Jane Doe #2 had no means of supporting herself and was in a foreign country where she did not speak the language. Jane Doe #2 had no identification or legal status in the United States, had no money, had never been to the United States prior, and had only a third-grade education. The defendant took advantage of Jane Doe #2's youth and vulnerability, selling Jane Doe #2's virginity to the highest bidder. (Tr. 1168-69 (Jane Doe #2 testifying that the defendant made calls saying "she had this girl who was a virgin.  Could this person pay money.")). Jane Doe #2 described feeling "filthy" and "sad" after her first night working for the defendant and her family because Jane Doe #2 "had never been with anyone until [she] got here" and because she was "forced to" have sex for the first time. (Tr. 1173). After that first traumatic rape, the defendant continued to force Jane Doe #2 to engage in prostitution, seeing twenty-to-twenty-five men per night, for months.

(Tr. 1174 (Jane Doe #2 testifying that after the first night she told the defendant the "didn't' feel well doing that, and that [she] did not want to be sent again," but the defendant told her she "had to pay back the 10,000-dollar debt")).

The defendant played an active and direct role in Jane Doe #2's abuse, preparing Jane Doe #2 to work by applying her makeup to make her look older and providing her with pills to prevent Jane Doe #2 from menstruating so Jane Doe #2 could work more. The defendant also demanded that Jane Doe #2 turn all of the money she made, including tips, over to the defendant, as compensation for the purported debt Jane Doe #2 owed the defendant for bringing Jane Doe #2 into the United States.

Jane Doe #2 was helpless and at the mercy of the defendant and the defendant made sure she stayed that way. The defendant went so far as to monitor Jane Doe #2's phone calls with Jane Doe #2's parents and to threaten Jane Doe #2, falsely telling her that if Jane Doe #2 was brought to the attention of immigration authorities Jane Doe #2 would be locked up, leaving Jane Doe #2 in fear and unable to seek help.

In addition to the defendant's direct abuse of Jane Doe #2, the Organization with which the defendant worked drove women, like Jane Doe #5, who were being victimized by other individuals, further facilitating their abuse. The Organization also required some of the women they drove, including Jane Doe #5, to engage in sex with Peiffer, a law enforcement officer protecting the Organization, ensuring that no victim would feel safe seeking help. Jane Doe #5 testified that her trafficker told her that the police would never help her and that the moment she was forced to have sex with Peiffer was the moment she "lost complete faith" and came to "believe everything everybody had told" her about the police. [2] (Tr. 1651-52).

The testimony of all of these victims at trial was powerful and painful. That testimony made clear that the defendant participated in the abuse of many women and girls and the impact of that abuse remains, even decades after the fact.

The defendant's history and characteristics are represented by her convictions. This was not a short-term or one-time offense. Rather the defendant was convicted of conduct spanning well-over a decade. The defendant spent much of her adult life abusing and exploiting women and girls for her own gain and targeted people, including her own niece, who were incredibly vulnerable. The consequences of the defendant's actions have been severe and the defendant has shown no remorse for her actions or the harm she caused the victims. Sex trafficking is a horrendous crime that strips victims of their dignity and self-worth, causing them unimaginable damage, and it warrants a strong deterrent effort. The defendant's predatory acts in this case caused irreparable harm to her victims, including to her own niece, Jane Doe #2. This dangerous and predatory conduct merits a strong sanction.

---

[2] This testimony by Jane Doe #5 was stricken for purposes of the jury's consideration, but her testimony was credible and relevant for purposes of sentencing.

IV. <u>Restitution</u>

Pursuant to Title 18, United States Code, Section 3663A, the Court is required to order restitution for the full amount of the victims' compensable losses. (PSR ¶ 240). To date, no victims have sought restitution.

V. <u>Conclusion</u>

For the foregoing reasons, the government respectfully requests that the Court impose a significant sentence above the mandatory minimum term of incarceration taking into account the Guidelines range of life imprisonment.

Respectfully submitted,

BREON PEACE
United States Attorney

By:    /s/ _____
Gillian Kassner
Rachel A. Shanies
Assistant U.S. Attorneys
(718) 254-6140

cc: Counsel for the defendant (by email and ECF)